FILED

MIDDLE DISTRICT OF FLORIDA

2013 MAR -4  PM 2: 18

| | |
|---|---|
| Randy A Scott, | ) Case No.: |
| | ) |
| Plaintiff, | ) RACKETEER INFLUENCED AND |
| | CORRUPT ORGANIZATIONS ACT |
| vs. | ) ("RICO") 18 U.S.C. § 1961 *ET SEQ.*, |
| | SARBANES-OXLEY ACT OF 2002 ("SOX") |
| LAWRENCE NORMAN YELLON, BOB | ) RETALIATING AGAINST A WITNESS 18 |
| MUSSER, H. ERIC VENNES, LANCE | USC § 1513 ET SEQ, FRAUDS AND |
| RANDALL, RONALD R. EZELL, STEVEN | ) SWINDLES 18 USC § 1341, AND 18 USC § |
| D. GLENN, JILLINA A. KWIATKOWSKI, | 1343 - FRAUD BY WIRE, RADIO, OR |
| RUTH A. REYNOLDS, GARY CROWE, | ) TELEVISION |
| NATIONAL ASSOCIATION OF | ) |
| PROFESSIONAL PROCESS SERVERS, | ) |
| PAUL TAMAROFF, FLORIDA | ) |
| ASSOCIATION OF PROFESSIONAL | |
| PROCESS SERVERS, JOHN AND/OR JANE | ) |
| DOE 1-3, | ) |
| Defendant(s) | ) |

1. COMES NOW the Plaintiff, Randy A Scott, as and for a claim against the

Defendants, alleges and shows to the court as follows:

## JURISDICTION AND VENUE

2. The court has jurisdiction under 28 USC § 1331 - Federal question(s)

3. The jurisdiction of this Court is a federal question conferred and invoked pursuant

to the Sarbanes-Oxley Act of 2002 ("SOX") 18 USC § 1513 - Retaliating against a witness,

victim, or an informant 18 U.S.C. § 1513 et seq., (specifically 18 U.S.C. § 1513(e),(f), and

(g), 18 USC § 1519 - Destruction, alteration, or falsification of records in Federal

investigations and bankruptcy.

4. The jurisdiction of this Court is conferred and invoked pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961 et seq., (specifically 18 U.S.C. § 1964(c)), and 28 U.S.C. § 1331.

5. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's FLORIDA claims for breach of contract, wrongful termination and defamation.

6. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's Arizona claims for improper expulsion from a non-profit trade association.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because Plaintiff resides here, and several defendant(s) known and unknown reside in this district and all events giving rise to Plaintiff's claim occurred within this district.

## THE PARTIES

8. The Plaintiff, Randy Scott (hereinafter "Scott"), is an adult resident of the State of Florida residing in Lee County with a post office address of 343 Hazelwood Ave S, Lehigh Acres, Florida 33936. At all times relevant to this action until his expulsion Plaintiff was listed on a directory and a member of the National Association of Professional Process Servers and earned his livelihood in the trade of process serving.

9. Lawrence Norman Yellon (**YELLON**), At all times relevant to this action, Defendant **YELLON** was, and is, in multiple agency capacities with National Association of Professional Process Server (NAPPS) and/or the New York State Association of Professional Process Servers (NYSPPA). Upon information and belief his address is 26 Ridge Road, Smithtown, NY 11787 or 820 LAVERS CIR APT G-304 Delray Beach, Florida 33444. and is, employed as President of NAPPS. YELLON violated 18 U.S.C. §§ 1962(c) and (d) by

actively participating in the named, individual Defendants' (hereinafter "RICO Defendants") scheme to fraudulently conceal and benefit from materially misstated federal tax forms erroneously provided to the Internal Revenue Service (hereinafter "IRS"), by defrauding the IRS, United States taxpayers and NAPPS members through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

10. Bob Musser **(MUSSER)** At all times relevant to this action, Defendant **MUSSER** was, and is in multiple agency capacities with National Association of Professional Process Server (NAPPS) and the Florida Association of Professional Process Servers (FAPPS) and owner and principal of Database Services INC (DBSINFO). Upon information and belief his address is 2780 Lake Howell Lane WINTER PARK, FL 32792 – 5726 or 5415 Lake Howell Road #327 Winter Park FL 32792. MUSSER violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants' (hereinafter "RICO Defendants") scheme to fraudulently conceal and benefit from materially misstated federal tax forms. Erroneously provided to the Internal Revenue Service (hereinafter "IRS"), by defrauding the IRS, United States taxpayers and members through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

11. H. Eric Vennes **(VENNES)** At all times relevant to this action, Defendant **VENNES** was, and is, in multiple agency capacities with National Association of Professional Process Server and the Washington State Association of Professional Process Servers (WSAPPS) and InsureTEK and Pacific Coast Insurance Group. Upon information and belief his address is 2926 6th Ave S. 2nd Floor Seattle, WA 98134. VENNES violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants'

(hereinafter "RICO Defendants") scheme to fraudulently conceal and benefit from materially misstated federal tax forms erroneously provided to the Internal Revenue Service (hereinafter "IRS"), by defrauding the IRS, United States taxpayers, and NAPPS members through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

12. Lance Randall (**RANDALL**) At all times relevant to this action, Defendant **RANDALL** was, and is, in multiple agency capacities with National Association of Professional Process Server (**NAPPS**) and/or the Florida Association of Professional Process Servers (**FAPPS**). Upon information and belief his address is 7731 NW 6 CT PEMBROKE PINES FL 33024-7057 or 5831 Hallandale Beach Blvd. West Park, Florida 33023. RANDALL violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants' (hereinafter "RICO Defendants") scheme to fraudulently conceal and benefit from materially misstated federal tax forms erroneously provided to the Internal Revenue Service (hereinafter "IRS"), by defrauding the IRS, United States taxpayers and NAPPS members through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

13. Ronald R. Ezell (**EZELL**), At all times relevant to this action, Defendant **EZELL** was, and is, in multiple agency capacities with National Association of Professional Process Server (NAPPS) and/or the Arizona Process Servers Association (APSA). Upon information and belief his address is 921 N CIRCULO ZAGALA TUCSON AZ 85745-8996. EZELL violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants' (hereinafter "RICO Defendants") scheme to fraudulently conceal and benefit

from materially misstated federal tax forms erroneously provided to the Internal Revenue
Service (hereinafter "IRS"), by defrauding the IRS, United States taxpayers and NAPPS
members through that concealment, and by attempting to silence Plaintiff from exposing the
errors and fraudulent concealment.

14. Steven D. Glenn **(GLENN)** At all times relevant to this action, Defendant
**GLENN** was, and is, in multiple agency capacities with National Association of Professional
Process Server (NAPPS) and/or the Process Server Association of Colorado (PSACO). Upon
information and belief his address is 8547 E. Arapahoe Road, Ste J, PMB 593 Greenwood
Village, Colorado 80112 or 10200 Park Meadows Dr **Lone Tree, CO** 80124. GLENN
violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual
Defendants' (hereinafter "RICO Defendants") scheme to fraudulently conceal and benefit
from materially misstated federal tax forms erroneously provided to the Internal Revenue
Service (hereinafter "IRS"), by defrauding the IRS, United States taxpayers, and NAPPS
members through that concealment, and by attempting to silence Plaintiff from exposing the
errors and fraudulent concealment.

15. Jillina A. Kwiatkowski **(KWIATKOWSKI)** At all times relevant to this action,
Defendant **KWIATKOWSKI** was, and is, in multiple agency capacities with National
Association of Professional Process Server (NAPPS) and/or the New York State Association
of Professional Process Servers **(NYSPPA)**. Upon information and belief her address is 115
S Prince Dr Depew, NY  14043 or 1320 French Road Depew, New York 14043.
KWIATKOWSKI violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the
named, individual Defendants' (hereinafter "RICO Defendants") scheme to fraudulently

conceal and benefit from materially misstated federal tax forms erroneously provided to the

Internal Revenue Service (hereinafter "IRS"), by defrauding the IRS, United States

taxpayers, and NAPPS members through that concealment, and by attempting to silence

Plaintiff from exposing the errors and fraudulent concealment.

      16. Ruth A. Reynolds **(REYNOLDS)** At all times relevant to this action, Defendant

**REYNOLDS** was, and is, in multiple agency capacities with National Association of

Professional Process Server (NAPPS) and/or the North Carolina Association of Professional

Process Servers **(NCAPPS)**. Upon information and belief her address is 1636 Glenn Street

Charlotte, North Carolina 28205 or 3008 POLO VIEW LN MATTHEWS,NC 28105.

REYNOLDS violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named,

individual Defendants' (hereinafter "RICO Defendants") scheme to fraudulently conceal and

benefit from materially misstated federal tax forms erroneously provided to the Internal

Revenue Service (hereinafter "IRS"), by defrauding the IRS, United States taxpayers and

NAPPS members through that concealment, and by attempting to silence Plaintiff from

exposing the errors and fraudulent concealment.

      17. Gary Crowe **(CROWE)** At all times relevant to this action, Defendant **Crowe**

was, and is, in multiple agency capacities with National Association of Professional Process

Server (NAPPS) and Alan H Crowe and Associates d/b/a as Crowe Foreign Services Upon

information and belief his address is 18170 NW Corinthian St, Portland, OR 97229 or 1020

SW Taylor, Suite 240 Portland, Oregon 97205. CROWE violated 18 U.S.C. §§ 1962(c) and

(d) by actively participating in the named, individual Defendants' (hereinafter "RICO

Defendants") scheme to fraudulently conceal and benefit from materially misstated federal

tax forms. These forms were fraudulently provided to the Internal Revenue Service (hereinafter "IRS"), by defrauding the IRS, United States taxpayers and NAPPS members through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

18. The Defendant, National Association of Professional Process Servers. (NAPPS), was, at all times material herein, a privately-held non profit domestic corporation doing business in the State of Arizona and engaged in interstate commerce with its principal place of business located at Portland, Oregon with an agency relation in Florida. For the purposes of Plaintiff's claims under 18 U.S.C. § 1964(c) (Counts One and Two), NAPPS is not a defendant, but rather the enterprise through which the RICO Defendants conducted their racketeering activity. For the purposes of Plaintiff's claims for breach of contract (Count Three), wrongful retaliation (Count Four), defamation (Count Five), NAPPS is the sole defendant. Upon information and belief NAPPS address is PO Box 4547 Portland, OR 97208-4547 Street, Portland, Oregon and/or 1020 SW TAYLOR ST STE 240 PORTLAND, OR 97205.

19. Florida Association of Professional Process Servers (FAPPS) At all times relevant to this action, Defendant FAPPS was, and is, an association in fact with the National Association of Professional Process Server (NAPPS) Upon information and belief the address is 7731 NW 6TH COURT PEMBROKE PINES FL 33024. FAPPS violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants' (hereinafter "RICO Defendants") scheme to fraudulently conceal and benefit from materially misstated federal tax forms erroneously provided to the Internal Revenue Service (hereinafter

"IRS"), by defrauding the IRS, United States taxpayers and NAPPS and FAPPS members

through that concealment, and by attempting to silence Plaintiff from exposing the errors and

fraudulent concealment.

20. Paul Tamaroff, (**TAMAROFF**) At all times relevant to this action, Defendant

**TAMAROFF** was, and is, in multiple agency capacities with National Association of

Professional Process Server (NAPPS) and the National Association of Sheriffs (NSA) and

the Union internationale des huissiers de justice (UHIJ) and the Georgia Association of

Professional Process Servers. Upon information and belief his address 2060 DEBORAH DR

NE ATLANTA GA 30345 3918. TAMAROFF violated 18 U.S.C. §§ 1962(c) and (d) by

actively participating in the named, individual Defendants' (hereinafter "RICO Defendants")

scheme to fraudulently conceal and benefit from materially misstated federal tax forms

erroneously provided to the Internal Revenue Service (hereinafter "IRS"), by defrauding the

IRS, United States taxpayers, and NAPPS members through that concealment, and by

attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

TAMAROFF is further identified as a defendant

21. The Defendant, DOES 1 - 3 was, at all times material herein, an anonymous

tribunal of the furthering, protecting and supporting the enterprise through a grievance

committee. At all times relevant to this action, UPON information and belief Defendant

DOES 1-3 were all members and/or a Treasurer and/or an officer and/or a director and/or as

part of the grooming to become one. The names or location are unknown but presume they

are in the Florida district. DOES 1-3 violated 18 U.S.C. §§ 1962(c) and (d) by actively

participating in the named, individual Defendants' (hereinafter "RICO Defendants") scheme

to fraudulently conceal and benefit from materially misstated federal tax forms erroneously provided to the Internal Revenue Service (hereinafter "IRS"), by defrauding the IRS, United States taxpayers and NAPPS members through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

## GENERAL ALLEGATIONS

22. On or about January, 2012 the immediate past president was expelled from NAPPS. I thought for certain he was retaliating against. A message to everyone that no one is to question the untoward and illegal practices of self dealing, IRS material misstatements, private inurement to those in authority, and expenditures of funds to silence those who bring up reasonable legitimate concerns regarding the operation of a tax exempt entity. Since that expulsion NAPPS enterprise continues on and will continue on to influence the rest of the members to secrecy. With my expulsion materializing it reinforces the continuity of the enterprise.

23. I contacted the United States Department of Justice (USDOJ) on or about March 15, 2012 and the Internal Revenue Service (IRS), both law enforcement agencies in February 2012 asking for their guidance into the specific questions of IRS reporting and antitrust issues I had concerning NAPPS. The failure of law enforcement to act does not diminish my reasonable and truthful reports to them.

24. On or about September of 2009 I was listed in the NAPPS directory for process servers. I received 1388 orders to the date of expulsion. These amounts resulted simply from

having my name listed on the directory of the nonprofit trade association. A competitive

benefit the trade outside of NAPPS does not possess.

25. I made the move to Florida in August of 2010. The move was with significant

adventure. The local authorities called the 20th Judicial certified process server board was

made up of other process serving companies in the area who were also NAPPS and FAPPS

members and customers of MUSSER's software exchange product.

26. My first call to the government licensing board and FAPPS was around March of

2010 and it was met with resistance. They didn't want more process servers in the trade. I

then wrote to the board and subsequently sent a letter to the Chief Judge responsible for

licensing process servers as portioned here ...."In advance of this letter I have spoken to Mr.

Tardif and emailed, voice mailed, and received text from Mr. Averill. In addition I have

spoken to Lisa Kiesel Chief Deputy Court Administrator, and a Secretary to Richard

Callanan who referred me to Suzanne Ederr. Some phrases shared with me were "shoot the

dice" "all my eggs in one basket" in regard to applying as a certified process server in the

Honorable Chief Judge G. Keith Cary 20th district."  I later found out this 20th Judicial

certified process server board recently implemented a rule that capped the total licenses of

process servers at 125. I contacted local process servers to discuss and find out about the

market place and why the cap. I was told personal histories of the chair. I was told concerns

that licenses had to go to the chairmen, as a competitor, to his office to get their "license". In

conversations I learned that the cap was in response to some NAPPS and FAPPS members

who were either on the board or connected to the licensing board had a conflict with a major

regional provider who wanted to reduce the prices they paid the group. The cap I was told

was to prevent the regional providers from getting their own crew licensed to perform the work.

27. After my challenges to the chief judge, he removed the cap and the within three months the board also was removed. I received my license and moved on in a professional manner with the court and the administration offices. Until this day the 20th judicial circuit process serving agency appears to be well run respectful and cognizant of providing for appropriate regulations and accountability and competitive neutral to those it issues licenses to. FAPPS has indicated a desire as of June 2012 to get this government board back into power.

28. Plaintiff was a member of NAPPS receiving the benefit of 90% of his livelihood by being listed on the directory NAPPS controls from approximately July 2009, to January 22, 2013 at 7:30 pm.

29. From September, 2009, through January 22, 2013, Plaintiff received 1388 orders directly related to being listed in NAPPS controlled directory.

30. Based on the work received NAPPS is a competitive necessity to the trade of process serving as specifically related to the individual in the trade.

31. NAPPS members are the benefactors of an exclusive one way exchange between members and members and non members finding process servers using the directory. In other words the money isn't in looking the money is in being found.

32. NAPPS directory is an important source for non member firms to find servers across the country.

33. NAPPS directory excludes those in the trade who are not members from receiving business from those who exclusively search there.

34. NAPPS online directory for the exclusive benefit of NAPPS members to receive work in the trade is believed to receive over 60,000 hits a month of persons looking for process service providers.

35. Delaware child support government agency issued a contract that exclusively uses NAPPS members only.

36. United States Department of Justice (USDOJ) exclusive international contractor under the authority of the HAGUE international treaty states it is their intent to use NAPPS. members only.

37. The USDOJ contract accounts for over 7,000 service of process a month.

38. The UNION INTERNATIONALE DES HUISSIERS DE JUSTICE (UIHJ) uses NAPPS members exclusively through CROWE's direct approved affiliates.

39. As a NAPPS member Plaintiff had obligation, rights and privileges under Arizona law, Florida Law, Oregon Law, and the laws of the United States . In the US the IRS gives citizens access to IRS 990's of all tax exempt organizations.

40. As an IRS recognized tax exempt organization NAPPS had obligation, rights and privileges under Arizona law, Oregon Law, and the laws of the United States. In the USA citizens have rights and obligations to hold accountable to the IRS code tax exempt entities.

41. On or about April 18, 2011 at 4:18 pm I received a telephone call from VENNES who at that time was the arbitration and grievance (A/G) chair of NAPPS. He stated he received a complaint against my practices that he will mediate. We spoke for about 25

minutes regarding the issue. The content of the complaint is that a NAPPS member Patricia

Lupia from New York who has an associate non NAPPS member, Mike Lupia for Legal-

Works in New York. He stated that I refused to prepare two separate returns of service. The

one I sent I detailed the events that potentially made it an improper serve, but it was truthful

and accurate. The one he wanted me to prepare left out those details. VENNES emailed me at

4:58 pm asking me to prepare the 2 different return of services. Let them choose which one

to use, and fed ex them using their account number. I followed up and called him at 5:00 pm

and left message. He called me back and 5:02 pm and I told him if in his opinion this is

proper I will do as he instructed. This avoided sanctions or even a report properly or

improperly. My relationship with NAPPS made my business completely dependent to be in

the directory they provided online. That event developed a concern about what NAPPS

teaches or its underlying unseen operations are. The case Info relating to this matter is :

Case Number: 235887    County: RENSSELAER State:  NEW YORK    Court: Supreme

Contact:    Date Filed: Caption:  NBT BANK, vs. JOHN PRATT .

    42. Plaintiff was exposed to NAPPS's financial information through the IRS 990's

obtained from public sources such as http://www.guidestar.org   or

http://www.foundationcenter.org

    43. IRS 990's have printed on them in the upper right corner an IRS approved phrase

"OPEN TO PUBLIC INSPECTION"

    44. In December of 2011 I published FAPPS and NAPPS IRS 990's on a google

group soliciting member review of the financials.

45. In December of 2011 MUSSER respond's that publishing the IRS 990's could lead to an arbitration and Grievance complaint that will remove me from the associations.

46. After a flurry of emails and the issued threat I resigned from FAPPS

47. A January-March 2012 I started to review more in depth FAPPS and NAPPS IRS 990's forms. I made numerous requests from FAPPS and NAPPS and received unresponsive actions. I found board members of FAPPS paying for hotel rooms for Florida State representative to stay in. I found FAPPS board members getting free web ads for a total of $1050.00 in 2011. I found FAPPS paying $1301.00 for the utilities of an officer. I found NAPPS materially misstating the revenue over $600,000.00 in the past 5 years relating to advertising revenue for an evasion of taxes total in an amount over $200,000.00 . I found concerns relating to the improper reporting of $100,000.00 NAPPS contribution/gift/loan to the members of the New York delegation of which two sit on both the NAPPS association and the board of the receiving New York state association.

48. After starting my google group on about January 8, 2012 I began to receive telephone calls from other members who knew a lot more of the NAPPS and FAPPS. Many of these calls spoke about the improprieties I self discovered and added more:

1.  voice mail system purchase for the exclusive use of a board member in FAPPS
2.  Projectors purchased for the association but never used for the entity(ies)
3.  creation of a for profit franchise opportunity using the NAPPS assets of private board information
4.  private credit cards being used for over 150K of association business annually and reimbursed through association funds by checks written by the same person.
5.  The use of NAPPS resources money or title for gaining private inurement in the international trade

49. NAPPS has agency relationships and provides funds and support for its ASSOCIATIONS(s) through close guidance upon same. Some are chartered and officially recognized, some are IRS tax exempt and some are not. All received direct contributions of

money or in kind benefits from the assets of the NAPPS as follows. Arizona Process Servers Association (hereinafter APSA), California Association of Legal Support Professionals (hereinafter CALSPRO), Georgia Association of Professional Process Servers (hereinafter GAPPS), Florida Association of Professional Process Servers (hereinafter FAPPS), Michigan Court Officer, Deputy Sheriff & Process Servers Association (hereinafter MCODSA), New Jersey Professional Process Servers Association (hereinafter NJPPSA), New York State Professional Process Servers Association (hereinafter NYSPPSA), Oregon Association of Process Servers, Inc. (hereinafter OAPS), Tennessee Association of Professional Process Servers (hereinafter TAPPS), Texas Process Servers Association (hereinafter TPSA), Washington State Process Servers Association (hereinafter WSPSA). (hereinafter all combined "ASSOCIATIONS"). NAPPS controls the actions of the ASSOCIATIONS, the ASSOCIATIONS board members, and the ASSOCIATIONS members.

50. NAPPS has an annual conference where members physically present elect the board of directors.

51. These ASSOCIATIONS are required to attend the annual conference of NAPPS and present report(s) in order to remain in the "good graces" and receive any benefits the alliance may offer.

52. These members of the ASSOCIATIONS, who are required to attend, are also members of NAPPS and qualified electors at the NAPPS annual conference.

53. These ASSOCIATIONS received funds from NAPPS

54. These members who attend are reimbursed or fronted their expenses or portions thereof from their respective ASSOCIATIONS to attend these NAPPS annual conferences.

55. NAPPS enterprise payments made to the ASSOCIATIONS directly contributes to their attendance to support the enterprise through a takeover of the legitimate purpose of an election.

56. NAPPS code of ethics states "...Everything possible shall be done to avoid an appearance of impropriety and to protect the rights (emphasis added), interest and confidentiality of clients, entities being served, and the legal profession as a whole."

57. Plaintiff asserts the rights of the legal profession are protected when the IRS forms are legally prepared and filed.

58. NAPPS Policy No.3-Officers and Directors state "C. Conflicts of Interest Board Members have loyalties to NAPPS, to their individual companies and to other entities, including State Associations. Board Members must stay alert for potential or perceived conflicts between loyalties to those interests and disclose potential conflicts to the board, and proceed with great care when dealing with situations where the conflict may arise. In such cases, the board member should consider abstaining from voting on an issue." (emphasis added)

59. Plaintiff expulsion was voted on and included MUSSER who stated IRS forms are government garbage, EZELL who signed the perjured IRS 990 for 2011 and KWIATKOWSKI who as President of the New York state charter received over 100K in the past 2 years. In addition it included REYNOLDS who as President of North Carolina Association of Professional Process Servers received support through NAPPS, VENNES as administrator of WSPSA a non IRS recognized tax exempt association received support as an ineligible charter under NAPPS rules, GLENN as President of the PSACO non IRS

recognized tax exempt association received support from NAPPS, RANDALL as president of the FAPPS who received direct money contributions and in kind support from NAPPS

60. NAPPS policy state in order for a charter to be recognized by NAPPS they must maintain tax exempt status.

61. APSA, GAPPS, NJPPSA, OAPS, and WSPSA all have lost or never received the tax exempt status from the IRS.

62. IRS code states when a tax exempt entity gives money or in kind support to a non tax exempt entity it must report those conversion and pay taxes on them.

63. NAPPS does not report those conversions.

64. By not paying taxes NAPPS artificially and illegally increases total revenue that is then computed into the CROWES contract for his personal gain related to the evasion of taxes CROWE himself prepares.

65. CROWE supplies, prepares, and otherwise exclusively directs the completion of the IRS forms approved and supported by the board of directors in official non action to knowledge supplied them that shows the activities improper.

66. CROWE directs the ASSOCIATIONS to report the advertising revenue in the same manner. North Carolina and a California association both reference the material error in minutes of their respective boards and or IRS filings.

67. In 1986 the duly elected board of directors required upon itself that annually from that point forward NAPPS will have a CPA perform an annual audit of its finances.

68. NAPPS has never had an annual audit performed.

69. The treasurer Steve Janney referred to the requirement in his package to the membership at the annual meeting in Boston 2012. He requested a special procedure audit as the review indicated significant concerns that require more in depth review.

70. GAPPS representative TAMAROFF then motioned at the annual meeting in 2012 to rescind the annual audit obligation from 27 years earlier

71. NJPPSA representative Colasurdo motioned at the annual meeting in 2012 to start a lawsuit identify and expel members who "author negative posts about NAPPS" the association.

72. Mr Janney at the Boston conference was unelected as a treasurer and replaced with EZELL.

73. NAPPS has approximately 2,000 members that perform an estimate 2,000,000 process a year.

74. NAPPS markets and sells various consumer products and services in all fifty states and the following countries or territories Australia, Bahamas, Belgium, Brazil, Canada, Cayman Islands, China, Dominican Republic, France, Germany, Hong Kong, India, Ireland, Israel, Italy, Japan, Korea, Mexico, Netherlands, New Zealand, Philippines, Puerto Rico, Scotland, Spain, Switzerland, Taiwan, United Kingdom, US Virgin Islands.

75. For financial reporting purposes, NAPPS fiscal year ends ("FYE") on the last day of June of each year until 2010. For FYE ending June 2010 a revised FYE occurred to December 31, for tax reporting purposes.

76. In FYE 2011, NAPPS generated approximately seven hundred and fifty six thousand dollars in revenue, derived from interstate and international sales of its products and services.

77. All income derived from interstate and international commerce is to be reported truthfully on IRS Form 990, a nonprofit corporate income tax return form. NAPPS collects gross income from foreign sources including membership fees and advertising income.

78. The advertising income contained within IRS Form 990 is to be reported on Part VIII 11A on IRS Form 990, (Miscellaneous Revenue),

79. IRS Form 990 is used to calculate the tax obligations and its purpose is to report all income and expenses incurred and attributed to that income. From this, one can then determine the net revenue to determine tax obligations.

80. There are two types of revenue on this form. One type called program services revenue. This is revenue that is directly tied to the exempt purposes of the tax exempt organization and IS NOT taxable. Another type is revenue that is comparable to a for profit entity such as advertising that is taxable.

81. In the past 30 years and specifically the last 5 years NAPPS has materially misstated this income advertising revenue and evaded taxes.

82. In the past 30 years Alan H CROWE and associates have exclusively maintained the administrator position at NAPPS and performed all obligations with full support and full knowledge of the RICO defendants to current.

83. GLENN, RANDALL, CROWE met in Lousiana on November 17, 2012 to discuss the branch office policy revisions. CROWE was the apparent chair of the committee in the absence of Jack Lippman.

84. CROWE chairs the committee that revises policy on branch office policy.

85. Branch office policy is additional listings on the web site and the directory.

86. Additional listings are advertising to the private inurement of the purchasing member.

87. Advertising revenue to the private gain of an individual is revenue taxable to a non profit.

88. CROWE prepares the data for the preparation of the IRS 990's non profit tax form.

89. The IRS 990 indicates in the affirmative the board has a copy of the form before it is mailed or wired.

90. CROWE submits the form to the IRS with EZELL's signature on May 15, 2012.

91. CROWE uses the tax evaded in his calculations for his private administrator contract as a percentage of total revenue of NAPPS.

92. CROWE gains a percentage of the tax not paid.

93. The board approves CROWE presentation by voting for the contract under these known terms.

94. In the July 2012 profit and loss statement issued by NAPPS it branch office is categorized as Advertising. When translated to the IRS form 990's NAPPS materially misstates it with the intent to evade the tax consequences by combining it improperly as

program services revenue, member revenue or other various improper entries over time. In

some instances the revenue appears to be absent entirely. Upon information and belief

between 2004 -2008 over 100K relating to this advertising revenue in not reported in any

fashion in the IRS 990's. This amount is apparently missing in its entirety from any financial

records available to members or the prepared and submitted IRS filings.

95. The amount of the advertising is 2011 FYE 12/2011 $210,245.00, 2010 FYE

12/2010 85,895.00 2009 FYE 06/2010 $255,789.00 (this year was an additional anomaly as

upon information and belief they included it as convention revenue), 2008 FYE 06/2009 this

year it may be included in membership fees but otherwise absent. 2007 FYE 06/2008 again

this revenue stream believed to be at least $150,000.00 is absent in any recorded fashion.

96. In 2009 and in view of various corporate concerns the IRS revised the form 990's

to get entities to start revealing to the IRS some management related issues. Upon

information and belief the IRS revised the form in order to use the responses as a review

algorithm. If certain questions are answered in certain ways the IRS will assign a value and

in that value it will determine if further review is necessary. Depending on the value of the

responses will depend on the significance of the review.   Part VI section B 11a offer the

question "Has the organization provided a complete copy of this Form 990 to all members of

its governing body before filing the form?" CROWE answered YES. 13 Did the organization

have a written whistleblower policy? CROWE answered YES 16a Did the organization

invest in, contribute assets to, or participate in a joint venture or similar arrangement with a

taxable entity during the year? CROWE answered NO. All three of these are material

misstatements designed to fly under the radar and avoid IRS review. The two answered

affirmatively are readily determined to be false. The one where NO was answered would require a simple review that would show Georgia, Arizona, NEW JERSEY, Washington are a few of the entities that are not tax exempt received funds and would alert the IRS to further review.

97. Between October 2011 and up until two hours before NAPPS notice that they are beginning my revocation I informed them of these IRS problems and they were aware of my law enforcement complaints.

98. On or about March 9, 2012 I contacted the United States Department of Justice (USDOJ) in regards to my findings relating to issues with private gain and IRS fraudulent tax filings.

99. On or about March 15, 2012 I received a response from the IRS.

100. On April 2, 2012 YELLON wrote in a facebook message to me "Hey Randy, I hear a parade coming. Get the rain machine ready. The IRS deliberately makes it fairly easy to correct oversights on non profit filings. (emphasis added) (Exhibit 4)"

101. On May 15, 2012 the CROWE , EZELL with the board approval filed another fraudulent return after my notices to them regarding same.

102. On November 12, 2012 TAMAROFF wrote in an email to me "Your claims might carry more weight if they were supported by a tax attorney. I realize of course that this would require an expenditure of personal funds. But, I believe every member of the Board has acted in good faith, based on advice from professionals. Assuming for argument sake that there might be some merit to your claims, they would be deminims in nature and not worth pursuing. (emphasis added)" (Exhibit 5)

103. On or about November 20, 2012 I spoke with GLENN via telephonic communication. He informed me that the board was advised NOT to read anything I send them.

104. On or about November 21, 2012 GLENN emails me "Again I implore you to call Gray Crowe the NAPPS Administrator, he may be able to answer your questions, as he deals directly with all of the items you listed. I have no response. The proper channel for your inquiry is the NAPPS Administrator; in the future please refer all questions regarding NAPPS to him."

105. On November 21, 2012 1:30 pm MUSSER wrote in an email to me "Thank you for pointing out what you believe to be an error. (emphasis added) (EXHIBIT 6)  I would think that simply raising the point would be enough that our treasurer and administrator will make sure we see the form next year. I think you're making a mountain out of a molehill. I'll tell you right now, that as an owner of multiple businesses, I've never reviewed any of my 990's. I pay my accountant to handle that kind "valuable government garbage", (emphasis added) and trust her to let me know when I need to pay more attention.  I also removed the tag from my mattress." (Exhibit 6)

106. On November 21, 2012 at 3:47 pm TAMAROFF sent me an arbitration and grievance complaint seeking my revocation. The person who presented it to TAMAROFF's committee was President YELLON. In the letter it has the following comment "He does not seek answers to his questions, but, instead accuses board members and the administrator of abusing authority, fiscal irresponsibility, violating policies and even IRS tax laws." (EXHIBIT 7)

107. On November 25, 2012 I faxed board members informing them that this is a violation of law and in retaliation for my law enforcement complaints. I asked them to cease and desist the violation.

108. At 12:33 pm on December 04, 2012 in ATLANTA, GA 30309. The mailer was signed for by P TAMAROFF which included my 197 page response including exhibits.

109. Between December 4th, 2012 and January 4th, 2013 numerous emails between me and TAMAROFF occur specifically asking the status of my counter complaints against the board, TAMAROFF, and YELLON. TAMAROFF indicated he will not hear the matters relating to the board and YELLON and has summarily dismissed them. In addition he referenced he is redacting my response to prevent the board and the DOES 1-3 from hearing my complete response.

110. On or about December 15, 2012 I spoke to Mr Tamaroff and asked him if I will get a copy of the complainant rebuttal and he told me no that is not the way they do it.

111. On January 4th, 2013 contrary to current bylaws that requires a notice to all members the board held a special meeting without any clear requirement as required under bylaws and issued the revocation. NAPPS bylaws governing special meetings "The membership shall be notified of all Special Board of Director meetings by posting a notice of the meeting on the NAPPS homepage and by email blast to the membership at least forty-eight hours (emphasis added ) if practical prior to the Special Board of Directors meeting. The Agenda for a special board meeting will include only those topics where a timely resolution is in the best interest of NAPPS, (emphasis added) and in which the membership is

better served by not waiting until the next regular board meeting. Neither of those two requirements were complied with.

112. On January 11, 2013 I received the revocation notice via USPS .

113. On January 17, 2013 I sent a priority mail response for them to address my concerns in my 197 page response.

114. On January 20, 2013 at 11:17 am YELLON posted the following on his Facebook account "Addition by subtraction. What a great concept. It really works. Why would someone join a not for profit trade association that benefits over 2200 people with the sole purpose of destroying that association? Addition by subtraction."

115. On January 22, 2013 at 11:56 am my response to the revocation notice was delivered according to the USPS.

116. On January 22, 2013 at 10:30 pm I checked my logon for NAPPS and reviewed their listing and it proved I was removed and I confirmed I was listed as expelled. In addition at the same time I reviewed the listing for two names that were revoked on November 17, 2012 a full two months prior and both names were still in the directory.

117. In a telephonic conversation on January 23, 2013 at 3:57 pm TAMAROFF informed me CROWE called him forthwith on January 22, 2013 and asked if he received my response.

118. On January 23, 2013 I emailed the Board the USDOJ and the IRS. I included a copy of my response received by NAPPS on January 22, 2013

119. For year ending 2010, and counting 18 months back NAPPS generated approximately 1.2 million in revenue, derived from interstate and international sales of its advertising, membership fees, and other products or services.

120. All income derived from interstate and international commerce is to be truthfully reported on IRS Form 990, a nonprofit corporate income tax return form. NAPPS collects gross income from foreign and domestic sources including dividends, royalties, interest, advertising, membership fees, and other products and sales income.

121. The income and expenditures contained within IRS Form 990 shows that NAPPS has a strong financial flow of money between itself and its ASSOCIATIONS.

**COMPLAINTS TO LAW ENFORCEMENT WERE REASONABLE BASED UPON NAPPS IRS 990 REVIEWS-REVENUE AND MEMBERSHIP INCONGRUITIES**

122. Under the NAPPS 7-year reporting period spanning 2004-2011 (2006 is missing and unavailable), the Membership Fund received from each member at $150.00 per year as dues. Starting 7/1/2010 reporting period the fee increased to $175.00. The membership fund should be divisive in whole numbers to $175.00. However, an initial examination of IRS form 990 shows that this was not the case. This was the initial review of the IRS 990's. Column 1 is the year, column 2 is the revenue listed on IRS 990, column 3 is the total revenue divided by the member fee and it shows what that amount would reflect in members, column 4 is actual estimated members based on publications, and column 5 is the whole amount based on column 4 multiplied by the member fee. The disparities are evident that additional non member fees are being included in these reports. In addition the change in accounting year whereby only six months are in the period signifies a major concern that the

deviation of the totals between 2009, 2010 and 2011 is not present. That money appears yet there is no good basis for it.

## MEMBER CONTRIBUTION CALCULATION

| 1 Year | 2 Total Member Contributions | 3. Division of total revenue/fee=member numbers Numbers of members based on revenue | 4. Estimated actual membership numbers From publications (EM) | 5. EM*fee Should be |
|---|---|---|---|---|
| 2004 07-01-2004 and ending 06-30-2005 | $348,907.00 | 2326.04 | 1504 | $225,600.00 |
| 2005 07-01-2005 and ending 06-30-2006 | $356,764.00 | 2378.426 | 1600 | $240,000.00 |
| 2006 07-01-2006 and ending 06-30-2007 | Unavailable | | 1700 | $255,000.00 |
| 2007 07-01-2007 and ending 06-30-2008 | $393,374.00 | 2622.493 | 1800 | $270,000.00 |
| 2008 07-01-2008 and ending 06-30-2009 | $447,675.00 | 2558.142 | 2000 | $300,000.00 |
| 2009 (07-01-2009 and ending 06-30-2010) | $367,219.00 | 2448.126 | 2100 | $367,500.00 |
| 2010 (Change in accounting year covers 6 months from July 1, 2010-December 31, 2010) | $373,803.00 | 2136.017 | 2200 | $385,000.00 |

| 2011 (01-01-2011 and ending 12-31-2011) | $399,833.00 | 2284.76 | 2200 | $385,000.00 |
|---|---|---|---|---|

Fee was $150.00 until 2009 $175.00 thereafter. Source part one or IRS 990's

## SCHEME 1-UHJ private dealing with information obtained from non-profit assets. CROWE, TAMAROFF, etal

123. In 1991 when a service of process from foreign country was needed to occur within the United States foreign participants found it difficult to get the United States and its actors to timely fulfill service of process., Apparently based on NAPPS trade magazine called the Docket Sheet the UIHJ was put into contact with the trade association NAPPS. The UIHJ called the NAPPS administrator Alan H Crowe in 1991 who was at that time performing private investigator work, process service work and other national service of process. With that call the prior Alan H Crowe and Associates changed his whole business model and is now known through his son and current NAPPS administrator CROWE in 2013 as an expert in the highly specialized field of international service of process. That originated with a call while he was representing NAPPS. That business was born from initial investments of NAPPS assets from travel to and hosting of events to further this private enterprise. Of the 2200 NAPPS members in 2013 a very select few beyond the enterprise receives any work. In addition, there are non-NAPPS members who are in the trade who were disadvantaged and had to compete against the tax exempt funding of these private deals.

124. To present NAPPS continues to expend nonprofit members' funds in travel and lodging and general continued support for **CROWE, TAMAROFF,** and Does 1-15 to reap

the benefits of a nonprofit. They appear to attend the events most recently without funds but "always wear the NAPPS lapel tag" indicating they are there for NAPPS and gain from the private benefit of the membership asset of representation.

### Scheme 2

125. The RICO defendants BOARD individually and collectively and as of yet unnamed parties conspired to bestow excess benefits for **CROWE** through his control of ALAN H CROWE and Associates via an administrator contract with NAPPS by not following IRS rules in regards to determining compensation. This scheme required fraudulent wire and or mail transfer of IRS 990 forms which contained materially false statements to avoid detection. Specifically requires the board to ignore the IRS rules for independent review and the board uses the percentage of revenue to rule. As detailed the administrator misstates the total revenue evades 80K in taxes and then for his percentage basis includes 80K in the calculation. If his percentage is 30%, he gains an additional 24K a year and controls all the calculations and the number it is based on. Without the board support, it does not happen, and therefore they become the same, support the enterprise, and benefit from it.

### SCHEME 6

126. In order to protect the enterprise the RICO defendant(s) MUST control the legitimate business of the NAPPS and make it into their enterprise. This is done, in part, by converting the tax exempt funds of NAPPS to private purposes of the enterprise. This is done to their private benefit by using the NAPPS resources to implement and protect their various schemes and their positions in same. The conversion of funds has occurred throughout the enterprise and the most recent examples follow:

127. NAPPS enterprise controls the funding between itself and its components. Some legitimate funding under IRS rules but most illegitimate funding under IRS rules. The annual convention was held in Boston, MA April of 2012. Those in attendance to then vote for the continuing operations use the expenditures from NAPPS.

**NAPPS immediate funding of Boston participants through ASSOCIATIONS called grants.**

| Budget accounts/ WHO RECEIVED | AMOUNTS | ALLEDGED PURPOSES | How many electors attended from the recipient state |
|---|---|---|---|
| Arizona charter | 510.00 | Chartered State Assn Grants | 4 |
| California charter | 2,510.00 | Chartered State Assn Grants | 23 |
| Florida charter | 2,610.00 | Chartered State Assn Grants | 12 |
| Michigan charter | 440.00 | Chartered State Assn Grants | 2 |
| New Jersey charter | 420.00 | Chartered State Assn Grants | 6 |
| New York charter | 2,110.00 | Chartered State Assn Grants | 43 |
| Oregon charter | 490.00 | Chartered State Assn Grants | 3 |
| Texas charter | 2,220.00 | Chartered State Assn Grants | 7 |
| Washington charter | 490.00 | Chartered State Assn Grants | 2 |
| Tennessee charter | 410.00 | Chartered State Assn Grants | 1 |
| Georgia | See amount below | | 5 |
| Illinois | See amount below | | 7 |

128. In the above graph it shows Tennessee received $410.00. This amount is not complete. Due to creative accounting shown through the numerous IRS filings and the reports issued to the members and upon information and belief an amount listed in Profit & Loss Budget 1/2012 – 6/2012 is a line number 6500 called equipment lease and in an amount further categorized in a simple term GRANT for the amount of $3,000.00 believed to be

payment of funds to Tennessee. Nevertheless, unless you studied the amounts involved it would be impossible to determine. This is a clear direction to deceive the membership and the IRS.

**NAPPS immediate and distant funding of Boston electors and participants through ASSOCIATIONS called legislative fund payouts**

| | | |
|---|---|---|
| FAPPS (Florida) | $ 2,105.41 | August 2003 |
| GAPPS (Georgia) | $ 8,583.00 | March 2004 |
| OAPS (Oregon) | $ 4,292.00 | March 2004 |
| GAPPS (Georgia) | $ 8,861 .00 | March 2005 |
| FAPPS (Florida) | $ 3,000.00 | March 2005 |
| FAPPS (Florida) | $ 1,094.53 | June 2005 |
| TAPPS (Tennessee) | $ 3,500.00 | July 2005 |
| WSPSA (Washington) | $ 3,000.00 | November 2005 |
| GAPPS (Georgia) | $10,250.00 | September 2006 |
| WSPSA (Washington) | $ 4,474.00 | March 2007 |
| GAPPS (Georgia) | $ 7,091.00 | September 2008 |
| GAPPS (Georgia) | $ 6,381 .00 | January 2009 |
| FAPPS (Florida) | $ 3,038.82 | March 2009 |
| GAPPS (Georgia) | $13,296.00 | September 2009 |
| ILAPPS (Illinois) | $7,000.00 | March 2011 |
| NYSPPSA (New York) | $25,000.00 | April 2011 |

129. NAPPS provides direct money contributions or in kind contributions to 10 non tax exempt entities called state charters and a new category of non chartered state associations. This continues the conversion of tax-exempt funds to non tax-exempt purposes. This translates to direct tax exempt funding of elector attendance at the national convention through the redirection of the state's contribution to the individual state members

representing the state and using those funds to attend and VOTE the continuation of the enterprise.

130. Of the 167 recorded eligible voters at the Boston conference 2012 at least 95 were there directly or indirectly present by the treasury funds of the controlling NAPPS enterprise and/or through their improper payments via the associations being used to send their own members to vote for the enterprise.

131. The RICO defendants and the predicates acts include a specific threat of repetition extending indefinitely into the future, and thus supply the requisite threat of continuity. Specifically the RICO defendant extended the administrator contract to 2018 which cannot be separated from the fraudulent preparation of IRS forms including over $80,000.00 in evasion of taxes the contract is based on.  The threat of continuity is established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes. The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise." The RICO defendants on a continuing basis misstate the IRS 990 forms, engage in self dealing and retaliate against anyone who would shine a light on the illegal practices and those that make complaints to law enforcement agencies. They continue to apply excess compensation on the

administrator, and most troublesome continue to expel members who inquire to these practices and especially those who report to law enforcement agencies violations of law.

132. The fraudulently prepared IRS 990 is sent wire or mail to the IRS. Sent via wire on May 15th, 2012, November 15, 2011, November 15, 2010, November 5, 2009. The communications of retaliation are sent via email AND US mail over interstate networks November 21, 2012, January 7, 2013 and February 11, 2013. The various schemes require material misstatements to the IRS, full support of the board and unnamed individuals directing or participating in the schemes to prevent a deeper review that would uncover the enterprise and the benefits received by the RICO defendants.

133. NAPPS 2009 IRS form 990 shows a program services revenue of $255,753. The NAPPS 2008 IRS 990 shows a program services revenue of $93,940. The second half of the change in accounting year shows 85,895.00. The program services are a material misstatement as it contains within it an amount listed under NAPPS most recent Profit And Loss statement revenue of Advertising which would be taxable at 41.6% if properly reported. The material misstatement causes the amount to go under the radar and taxed at ZERO. It is identified properly as advertising revenue within the profit and loss statement and then INTENTIONALLY converted to program services revenue on the IRS 990 forms.

134. The IRS form 990 requires that a nonprofit prepares it in a manner consistent with factual statements and signed under penalty of perjury. On the 2011 IRS 990 it has in Part VI Governance, Management, and Disclosure Section B. Policies (This Section B requests information about policies not required by the Internal Revenue Code yet the are

required to be truthfully answer) 11a Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form.

135. On December 22, 2011 at 9:32 am I emailed the secretary of FAPPS requesting the minutes from them as I was a member with them at that time also. I commended him for the electronic conversion of all the records and shared with him a link to the state statutes governing my request.

136. On December 22, 2011 2:20 pm I received a response from FAPPS president MUSSER essentially telling me my purposes are not proper

137. Then MUSSER and I get into a flurry of emails where I write on December 23, 2011 10:27am ..."I added FAPPS financials (irs 990's) for the past 3 years on my blog. I had to get this effortlessly from outside sources." I also wrote "I do still have an open question regarding the 2011 banner ads." The banner ads are advertising spots on the FAPPS website. The charge is $150.00 a year and 4 board members had spots for the past 11 months and not one board member paid for as I had mentioned specifically in person as I attended the November 2011 meeting. It was then reported in the meeting minutes of FAPPS for the November 2011 meeting that no board member had paid, a conversion of non profit funds to board members private gain. An event required to be reported to the IRS.

138. The emails became completely unproductive at the point MUSSER responded on December 23, 2011 2:45 pm ..."(Exhibit 1) If you do not remove our records from your website, you will probably be looking at an A&G complaint and might lose the right to call yourself a member of FAPPS. As I said in my first message to you: You have a lot of energy and could so easily be an asset to FAPPS. I hope you'll start working **within the**

**organization." (emphasis added)** The record will show the only thing I published at this time were NAPPS/FAPPS IRS 990 forms. IRS 990's are public records. The expulsion is about the IRS material indicating fraudulent filings of the administrators supported by the full knowledge and approval of the board and other fully informed actors and counselors.

139. On December 23, 2011 the unequivocal reminder came "Randy: Please reread my email. It quite clearly stated that you WILL PROBABLY be facing an A&G compliant if you continue republishing FAPPS documents (IRS 990's) without permission, and IF that happens, your membership MIGHT be subject to revocation. We just warned you today, there is no such complaint filed yet to my knowledge".

140. At this point, the threat was made and it was evident either I work, as he referred to it "within the system". That I not exercise my statutory rights under the US federal laws, the Internal Revenue service and the respective states of the ASSOCIATIONS laws. That if I exercise those rights I will face retaliation up to and including termination for my activities regarding the "open for public inspection" IRS 990's.

141. On December 29, 2011 I followed up to all FAPPS board members and MUSSER ..." As a member I am entitled to know whether or not the non-profit is complying with IRS 501(c) 6 requirements. As a member I am entitled to know if the leadership is directing the association according to Florida statutes relating to non profits associations. As a member I am entitled to know if the board is improperly expending association funds directly for purposes of lobbying as an unregistered lobbyist contrary to Florida laws."..."..."I would also recommend at this point to consider the implication the Sarbanes Oxley act has with my request(s)."

142. On December 29, 2011 11:59 AM I emailed FAPPS and MUSSER and resigned my membership. ..." The board has decided that providing me access to association comes at significant resistance please cancel my membership effective immediately for the remainder of 2011 and refund my money already paid for 2012. I also request you remove my name from all publications of the web site you control.

143. On December 29, 2011 5:38 PM NAPPS sent me via email the minutes for last three annual meetings of the NAPPS Association.

144. On or about January 5th, 2012 NAPPS placed on its website for the first time a letter I wrote as a contributor in NAPPS docket sheet. It is in the combined Sep-Oct/Nov-Dec 2011 issue. It is entitled "Promoting NAPPS" and it discusses transparency issues along with a concern that for profit entities are using NAPPS non-profit assets for private gain.

145. On January 20, 2012 at 12:24 pm I submitted a bylaw amendment to the secretary of NAPPS as follows:

> **Article X-Charter Associations**
> **Section 1- Charter associations must certify to NAPPS membership**
> **that NAPPS and its members will be held harmless and defended**
> **against at the cost of and expense of the charter and its members on**
> **any crossover issues regarding the nonprofit status of the charter**
> **negatively relating to IRC 501(c)6 non profit status of NAPPS or other**
> **tax consequences to NAPPS or its members.** This bylaw was
> subsequently published by NAPPS in its official communications to all
> members and presented at the annual meeting conference in Boston in
> April 2012. I voluntarily tabled the amendment for consideration at the
> 2013 conference.

146. On February 05, 2012 9:55 AM I emailed MUSSER...:

> "I appreciate the opportunity to share my comments to you and I am
> hopeful this outreach is appreciated with a timely substantive response
> and correction. **I hope anyone reading this who hasn't ever read the**
> **990's think again the reason they are on the board. They are certified**
> **you have read them.**(emphasis added)

**"My attorneys tell me that preparing and filling out my forms and following instructions in returns of service are something they appreciate. As a professional process server I appreciate those comments. As a named professional process server association I would believe professional starts with foundational aspects of the trade and that is filling out forms correctly. There are over 4000 process servers in Florida. Over 400 NAPPS members in Florida. Over 200 FAPPS members in Florida. And over 18 million tax payers that are all stakeholders in our nonprofit mission. With that comes tremendous accountability to many entities. I hope this letter meets you with the single most important factor and that is to govern yourselves accordingly."**

**"I don't write this to trouble you but guide you and secure and defend my professional business operations by confronting the deviations in some leadership of process servers in Florida. <u>I hope it is done correctly this year. I am offering you this notice as it is what I expect and will verify.</u>" (Emphasis added)**

147. On February 6, 2012 at 10:50 AM MUSSER responded back with the thread intact and copied to all board members "Thank you for your input."

148. On February 27, 2012 I emailed the treasurer of NAPPS Steve Janney and ask for the most recent 990 since those are not yet on guidestar.com and without delay the same day at 3:09 pm he emailed me the 990 for the 2010 July 1- December 31, 2010. It was for half a year because NAPPS has changed their accounting year to a calendar year.

149. On February 27, 2012 in the same thread as previous paragraph Mr Janney copied his response to YELLON. I followed up in the thread to Mr Janney and YELLON at 11:27 am with these concerns of the IRS 990's "Also in the 7-1-2009 – 6-30-2010 reporting period on form 990 for 2009 it shows an amount for convention revenue of $255,729.00. The previous year's 990's all had the convention revenue of under $80,000.00 could you explain why there is such a significant deviation?

150. On March 9, 2012 and various times I contacted the IRS division of Exempt Organization enforcement (another law enforcement agency) and explained my concerns

about conversion of monies to non tax exempt eligible charters, and how NAPPS is

materially misstating its reports to them. (Exhibit 2)(Exhibit 3)

151. On or about April 25th, 2012 the agenda package for the annual meeting was

received. In it Steve Janney NAPPS treasurer addressed some concerns relating to our tax

liability on page 30, it reads:

> "On July 13, 1985 in Denver, Colorado a motion was made and
> unanimously adopted that the books of the Association be audited
> yearly by a certified public accountant. As far as I can determine that
> motion has either been ignored or forgotten...
> ..."

152. On or about April 25th, 2012 the agenda package for the annual meeting to be

held in Boston was received the Treasurer Steve Janney included in his report a letter he sent

to the board on February 27, 2012 follows:

> "On February 23, 2012 I went to the NAPPS office in Portland at your
> request in order to review documents and backup to expenditures
> because the administrator would not scan and email me the financial
> documents I requested and you would not compel him to do so. I only
> spent 3 hours there, but these are some of my thoughts and concerns.
> Violation of Policies regarding reimbursement of expenses:
> We have continually violated policies regarding the submitting and
> payment of travel expenditures"

153. On or about April 25th, 2012 at the annual meeting of NAPPS 2 motions from

the floor occurred relating to these issues, as follows:

> NEW BUSINESS
> Motion by Jerry Colasurdo to hire an independent investigator and file
> a lawsuit if necessary to find the creator(s) of www.nappswatcher.com
> and authors of negative posts and to remove them from the association
> if they are members, 2[nd] by Tim Couch"
> Discussion Vote: Motion passes.
>
> Motion by Alan Goodman to rescind the resolution from 1985 for an
> annual audit, 2nd by Paul Tamaroff
> Discussion Vote: Motion passes

154. On or about April 25th, 2012 at the annual meeting the treasurer who brought

this improper tax filing issues to the membership was unelected and replaced with EZELL.

155. On or about August 17, 2012 I sent letter to the IRS exempt organization law enforcement agency in Texas, with separate inquiries into OAPPS, GAPPS, and APSA,

156. On or about August 23, 2012 I sent letter to the IRS exempt organization law enforcement agency in Texas, with separate inquires into NJPPSA, and WSPSA.

157. On Or about September 18, 2012 I sent additional material to the IRS law enforcement agency relating to the material issue of misreporting Unrelated Business Taxable Income (UBTI) of over $500,000.00 over the past 3 years or a potential tax avoidance of over $200,000.00. This revenue generation is from the sale of advertising space on NAPPS website. This "extra" money is foundational to the expenditure of the NAPPS enterprise and material to all the instances of the false filings.

158. November 16, 2012 I contacted the IRS and asked them the status of the IRS 990 for 2011 for NAPPS and they informed me it was filed on May 15, 2012. At 100 pm the same day I emailed the board this

> "UPDATE THE 2011 990 APPEARS TO HAVE ALREADY BEEN
> FILED WITHOUT YOUR REVIEW:
>
> Here is the docket where the treasurer informs us about the IRS990 for 2011
> and its status http://www.napps.org/docket/_pdfs/M_A_2012treasurer.pdf
> This was done during your terms as fiduciaries on the board. Is the
> statement in Part VI section B 11a true. **Did you review it before it was
> filed?** Please keep me posted,
> Thank you Randy Scott

159. Without any response from the any member of the board and on November 21, 2012 12:43 pm  I sent this to the board:

> "The IRS states they received the 990 2011 on May 15th, 2012. I
> understand this board was in place at the time of the preparation of the 990
> and then the subsequent filing of it. I also know based on conversations
> with some, that ALL board members did not review it first and I speculate
> the majority of you did not.".

…"**In the absence of being able to get the 990 from you I have requested it from the IRS directly see attached**…"

160. On November 21, 2012 I received this response from MUSSER (Exhibit 6)

"Randy, I'm curious about one concept. What benefit do you think you are providing the members by stirring this pot? **Are you trying to trigger a tax audit?** That will cost the members money. If you are simply trying to help us ride the straight and narrow, you would confine your comments strictly to the board, not on any Facebook or personal website. **And you wouldn't need to be starting discussions or retrieving documents from the IRS**. I have no idea how they work, but I can't imagine that your additional traffic with them could do NAPPS any good.

Thank you for pointing out what you believe to be an error. I would think that simply raising the point would be enough that our treasurer and administrator will make sure we see the form next year.

I think you're making a mountain out of a molehill. I'll tell you right now, that as an owner of multiple businesses, **I've never reviewed any of my 990's. I pay my accountant to handle that kind "valuable government garbage",** (emphasis added) and trust her to let me know when I need to pay more attention. I also removed the tag from my mattress.

Bob Musser

161. November 21, 2012 at 3:47 pm plaintiff received via email a complaint for expulsion dated November 13, 2012 yet the actual copy of the complainant letter attached shows November 21, 2012. The RICO enterprise held a board meeting in Louisiana on November 17, 2012.(exhibit 7)

162. In a letter dated January 7th, 2013 the board held a special meeting January 4, 2013 and did not notice it as required under our most recent bylaw nor cite any authority that the special board meeting met the requirement of a special board meeting. In that meeting the board voted to revoke my membership.

163. On February 2, 2013 in Fort Lauderdale Fl the board proposed a question if they allowed me to remain listed in the directory as a member would I stop my efforts regarding publicizing the IRS material.

164. On February 11, 2013 I received from the board due to my failure to become silent regarding the issues of the IRS violations the board voted to uphold the suspension.

165. On February 12, 2013 at 8:24 pm I received a telephone call from the second most significant directory on the internet who informed me because they want to remain on the good side of NAPPS they could not let me join their yahoo group.

166. On February 18, 2013 at 5:15 pm I received an email from an attorney claiming to represent NAPPS informing me to cease my publications regarding the truthful statements that led to my expulsion.

167. On February 22, 2013 at 6:09 pm I received another letter from the attorney indicating more concerns of recent publications.

168. On February 27, 2013 I received an email from a committee member of FAPPS telling me to cease sending my emails to him and FAPPS members.

**THE ENTERPRISE**

169. NAPPS was and is the passive instrument of the RICO Defendants' racketeering activity and constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), separate and distinct from the individual RICO Defendants named herein.

170. From approximately 1986 and continuing through current , the RICO Defendants, as well as others known or unknown, being persons employed by and associated with NAPPS, which was and is engaged in and the activities of which affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity, that is, through the commission of two or more racketeering acts set forth herein.

171. Plaintiff seeks to prohibit the RICO Defendants from utilizing the pattern of unlawful conduct in which they have continually engaged during the relevant time period and expect to continue.

172. The pattern of racketeering engaged in by the RICO Defendants involved at least two separate but related acts of racketeering activity, carried out from approximately 2005 through February 11, 2013

173. Plaintiff was directly injured by the RICO Defendants' acts of racketeering activity.

## PREDICATE ACTS & THE PATTERN OF RACKETEERING ACTIVITY

174. Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) 18 U.S.C. § 1513 (relating to retaliating against a witness, victim, or an informant) and 18 U.S.C. § 1519 (relating to destruction,

alteration, or falsification of records in Federal investigation and bankruptcy). As set forth below, the RICO Defendants engaged in conduct violating 18 U.S.C. §§ 1341, 1512, 1513 and 1519 to effectuate their unlawful scheme.

175. The RICO Defendants' acts were not isolated, but rather formed a pattern of conduct through which the RICO Defendants used the enterprise, NAPPS, to defraud the IRS and United States taxpayers, and the regular members of NAPPS, for personal, monetary gain, and to silence Plaintiff and to send a message to other within the organization. The message was to secure their enterprise by eliminating, destroying, and isolating those who complain about and expose such illegal and fraudulent acts.

176. The pattern of the RICO Defendants' illegal racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), and 18 U.S.C. §§ 1341, 1512, 1513 and 1519, are based on the following facts:

177. On March 15, 2012 I contacted the IRS division of exempt organization to make a complaint to the law enforcement agency relating to the fraudulent evasion of taxes.

178. On April 2, 2011 YELLON's post in a FACEBOOK group " HEY RANDY I HEAR A PARADE COMING. GET THE RAIN MACHINE READY. THE IRS DELIBERATLY MAKES IT FAIRLY EASY TO CORRECT OVERSIGHTS ON NON PROFIT FILINGS".

179. On April 15, 2012, Plaintiff emailed Defendant EZELL, KWIATKOWSKI, YELLON and VENNES with Jason ORME the CPA and cc the IRS regarding errors and asked them to correct future filings.

180. On May 15, 2012, Defendant CROWE, EZELL with Claire Scull and Jason Orme prepared erroneous IRS form 990's FYE 2011. Specifically they ignored my request one month earlier and again prepared and submitted materially misstated approximately $210,245.00 in taxable advertising revenue as non taxable and evaded over $80,000.00 in taxes. Furthermore CROWE and EZELL on line 11a and 13 dealing with management of the non profit they stated in the affirmative 1, they have a written whistleblower policy and 2 they give the form to the board before filing. Both should have been marked in the negative. The IRS uses these statements in an algorithm to determine audits. By misstating those simple questions is material as it prevents the IRS from evaluating for further review.

181. Since approximately January 1986, Defendants embarked upon an unlawful scheme and agreement to defraud the IRS and United States taxpayers and NAPPS members by committing predicate acts to conceal, abuse and indirectly benefit from, the errors contained within the IRS 990's reports relating to NAPPS's FYE 1986, and every year to 2011 relating to taxable revenue called additional listings. In the last five years every year the form would have been mailed or electronically sent.

182. Defendant CROWE, EZELL, MUSSER, and their CPA Jason ORME despite Plaintiff's inquiry, never disclosed the errors to the IRS, thereby allowing NAPPS, the corporate enterprise, to fraudulently receive approximately $400,000.00 in tax evasion for FYE 2007, 2008, 2009, 2010, and 2011.

183. To conceal NAPPS's fraudulent receipt of the tax for FYE 2007, 2008, 2009, 2010, and 2011, Defendant CROWE, MUSSER, YELLON, forced out a prior president

through the expulsion process. In December of 2011 Plaintiff was told by MUSSER to work within the system or face a similar fate.

184. Each subsequent, fraudulently and materially false filing with full knowledge IRS 990 form from the most recent FYE 2007, 2008, 2009, 2010, and 2011 was submitted to the IRS via United States mail. 2011 was submitted May 15, 2012

185. Each expulsion notice was subsequent, fraudulently submitted to those who complained to the IRS via United States mail.

186. On November 17, 2011 the CROWE, RANDALL, KWIATKOWSKI, YELLON, EZELL, VENNES, REYNOLDS, GLENN, MUSSER and ESTIN approved approximately $1,200,00.00 for the administrator that included as a percentage of total revenue the prospective evaded taxes to continue for the years 2013-2018 for the administrator contract. This was done without independent review and based on the fraudulent 2011 and prior IRS tax filings determining a total revenue including the evaded tax amount.

187. On or about November 19, 2012 in a telephone conversation GLENN informed me that upon advice the board should ignore communications I send to them.

188. On November 21, 2012 849 am I wrote a detailed analysis of the tax issues to GLENN including the contents describer here.

189. On November 21, 2012 at 11:30 am in an email from GLENN he writes" Again I implore you to call Gray Crowe the NAPPS Administrator, he may be able to answer your

questions, as he deals directly with all of the items you listed. I have no response. The proper channel for your inquiry is the NAPPS Administrator, in the future please refer all questions regarding NAPPS to him. Steve Glenn

190. On November 21, 2012 at 1:30 PM MUSSER wrote in an email to me that he also copied CROWE, RANDALL, KWIATKOWSKI, YELLON, VENNES, EZELL, REYNOLDS, GLENN and ESTIN, ..." Thank you for pointing out what you believe to be an error. I would think that simply raising the point would be enough that our treasurer and administrator will make sure we see the form next year. I think you're making a mountain out of a molehill. I'll tell you right now, that as an owner of multiple businesses, I've never reviewed any of my 990's. I pay my accountant to handle that kind **"valuable government garbage",** and trust her to let me know when I need to pay more attention. I also removed the tag from my mattress."

191. On November 21, 2012 at 3:47 pm TAMAROFF sent the notice beginning the expulsion. His cover letter is dated November 13, 2012 the complainant letter attached is by President YELLON dated November 21, 2012. In the letter YELLON refers 6 times to my IRS inquiries as a basis of his complaint. In President YELLON's complaint he acknowledges my IRS complaint as follows: "To the IRS: ... They [the NAPPS board] have used policy to expel members who inquire into records to evaluate and hold them accountable. They recently created a policy that suggests if two or more members share among themselves financial records to evaluate the proper handling of compliance issues they will be disciplined up to and including expulsion. The board has proven this recently by

expelling a former president because he talked about finances that he believed were improperly reported to you the IRS."

192. On November 21, 2012 the complainant President YELLON wrote the letter  the prior cover is based on.

193. On November 25, 2012 Plaintiff sent a letter via fax to RANDALL, GLENN, KWIATKOWSKI, REYNOLDS, ESTIN, and VENNES asking them to cease the retaliations as it is illegal under US law as the complaint relates to my law enforcement complaints. I sent this to them describing the direct conflict of EZELL, MUSSER and YELLON.

194. On December 2, 2012 I sent a 197 page response with including attachments.

195. On January 7th, 2013 the board held a special meeting contrary to the requirement of the bylaws they did not notice the membership and at this meeting the voted to expel me from the membership.

196. On January 17, 2013 I sent a reconsideration notice pursuant to the bylaws.

197. On January 22, 2013 at 11:30 am the response was received by TAMAROFF according to the USPS.

198. On January 22, 2013 at 7:30 pm I was removed from the directory and listed as expelled and later informed TAMAROFF did not pick up the reconsideration timely.

199. On January 22, 2013 at 8:00 pm  I checked on members who were expelled on November 17,2012 meeting and they were still in the directory listed on line.

200. On February 2, 2013 Plaintiff went to Fort Lauderdale hoping the board would correct its actions they refused.  Defendant TAMAROFF question if I would cease my concerns relating to the IRS TAMAROFF queried if the board reconsidered the expulsion would I cease the IRS concerns with the membership.

201. On or about February 11, 2013, Defendant TAMAROFF wrote a letter affirming the board actions NOT to reconsider.

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1961 *ET SEQ.*,)

202.  Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by...any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."

203. As set forth above, the RICO Defendants are employed by affiliated with or otherwise representing an enterprise, NAPPS, which engages in interstate and foreign commerce.

204. As set forth above, the RICO Defendants, as individuals of the enterprise, used their positions with NAPP's to conduct or participate, directly or indirectly, in the conduct of NAPPS's affairs through a pattern of racketeering activity.

205.  As set forth herein, the RICO Defendants' pattern of racketeering activity is comprised of predicate acts including mail fraud, tampering and retaliation.

206. As set forth above, the pattern of racketeering activity engaged-in by the RICO Defendants was for the common purpose of concealing and benefitting from erroneously-provided federal tax forms, to defraud the IRS and United States taxpayers and NAPPS members through that concealment, and to silence Plaintiff from exposing that concealment.

**18 U.S.C. § 1962(d)**

Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

207. The RICO Defendants' conspiracy to conceal and benefit from erroneously-provided federal evasion, to defraud the IRS and United States taxpayers and NAPPS members through that concealment, and to silence Plaintiff from exposing that concealment, as described above, violates 18 U.S.C. § 1962(d).

208. Each RICO Defendant agreed to participate, directly or indirectly, in the conduct of the affairs of NAPPS through a pattern of racketeering activity comprised of numerous acts of mail fraud, tampering and retaliation, and each RICO Defendant so participated in violation of 18 U.S.C. § 1962(c).

**COUNT ONE:  VIOLATION OF RICO 18 U.S.C. § 1962(c)**

209. Plaintiff realleges and incorporates by reference herein against the RICO Defendants paragraphs 1 – 201 above, as if fully set forth herein.

210. As alleged with particularity above, the facts demonstrate that the RICO Defendants willingly and knowingly conducted or participated, directly or indirectly, in the conduct of NAPPS's affairs through a pattern of racketeering activity.

211. As alleged with particularity above, as a direct and proximate result of the RICO Defendants' aforementioned RICO conduct, Plaintiff's lawful employment and livelihood have been irreparably damaged.

212. As alleged with particularity above, the RICO Defendants are jointly and severally liable to Plaintiff for treble damages, together with all costs for this action, plus reasonable attorneys fees as provided by 18 U.S.C. § 1964.

213. To the extent permitted by law, Plaintiff is entitled to damages, plus court costs, and pre and post-judgment interest at the legally allowable limit.

### COUNT TWO: VIOLATION OF RICO 18 U.S.C. § 1962(d)

214. Plaintiff realleges and incorporates by reference herein against the RICO Defendants paragraphs 1 – 201 above, as if fully set forth herein.

215. As alleged with particularity above, the facts demonstrate that the RICO Defendants conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of NAPP's through a pattern of racketeering activity.

216. As alleged with particularity above, as a direct and proximate result of the RICO Defendants' aforementioned RICO conduct, Plaintiff's livelihood have been irreparably damaged.

217. As alleged with particularity above, the RICO Defendants are jointly and severally liable to Plaintiff for treble damages, together with all costs for this action, plus reasonable attorneys fees as provided by 18 U.S.C. § 1964.

218.  To the extent permitted by law, Plaintiff is entitled to damages, plus court costs, and pre and post-judgment interest at the legally allowable limit.

**PRAYER FOR RELIEF AS TO RICO COUNTS ONE AND TWO**

219.  WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

220. a. Treble the amount of all lost income Plaintiff would have received but for Defendants' unlawful conduct, including but not limited to lost income and future lost income;

221. Compensatory damages in an amount to be determined at trial to compensate Plaintiff for the damage to reputation, loss of career, humiliation, anguish and emotional distress caused by the RICO Defendants' unlawful conduct;

222. Treble and/or punitive damages as allowed by law;

223. An award of reasonable attorneys' fees, costs and litigation expenses pursuant to 18 U.S.C. § 1964(c) and all other applicable statutes; and

224. Such other relief as the Court may deem just or equitable.

**COUNT THREE SARBANES-OXLEY ACT OF 2002 ("SOX") 18 USC § 1513 RETALIATING AGAINST A WITNESS,**

225. In order to avoid detection they must improperly report certain governing sections of IRS forms and to protect that scheme and keep it under the radar NAPPS enterprise have established a pattern of retaliation. They expelled Jeff Bannister a former president of the association in November 2011 for discussing public information available on the IRS 990's. The RICO defendants expelled a former president who was investigating the excess benefit of the administrator. Upon information and belief the RICO defendants have over the past 10 years retaliated against at least 5 individuals who inquired about the illegal activities associated with the IRS filings. There are additional person(s) believed to have resigned to prevent expulsion. The RICO defendants clearly shows the enterprise will go unabated, continue indefinitely and benefit from their illegal retaliatory actions against those who make reasonable inquiries or complaints regarding violations of law to law enforcement agencies.

**COUNT FOUR FRAUDS AND SWINDLES 18 USC § 1341, AND 18 USC § 1343 - FRAUD BY WIRE, RADIO, OR TELEVISION**

226. The RICO defendants EZELL, and CROWE prepared fraudulent IRS 990's and mailed or wired them to the IRS on May 15, 2012 . In the fraudulent prepared forms was information the RICO defendants RANDALL, MUSSER, REYNOLDS, VENNES, YELLON, KWIATKOWSKI, GLENN and ESTIN were knowledgeable of and approved

227. The RICO defendants prepared fraudulent IRS 990's and mailed or wired them to the IRS on November 15, 2011, and November 5th, 2009

228. On November 17, 2012 The RICO defendants used the fraudulent material in the IRS 990 filing of May 15, 2012 for personal gain for themselves and their coconspirators. They extended the administrator contract for 5 years AND continuing to the year 2018 at an amount of over $1,200,000.00 that includes the gains of the evasion of taxes, the removal of IRS audit risk in materially misstating the governing operations sections of the form signed under penalty of perjury.

229. The RICO defendants on November 21, 2012, January 7, 2013, January 25th, 2013 and February 11, 2013 wired via email a notice that retaliates for plaintiff complaints to law enforcement.

230. The RICO defendants on January 7, 2013 wired via email a notice that revokes member livelihood for plaintiffs complaints to law enforcement.

### COUNT FIVE : BREACH OF CONTRACT

231. Plaintiff realleges and incorporates by reference paragraphs 1 – 199 above, as if fully set forth herein.

232. Defendant's "BYLAWS"'and "CODE OF ETHICS" states an express contract between Defendant and its members, including the Plaintiff.

233. Where interpretations of bylaws or code of ethics conflict with Sarbanes Oxley regarding reports to law enforcement agencies regarding fraudulent activity that section cannot or should not survive.

234. Plaintiff qualifies under all provisions of Defendants bylaws and code of ethics. Specifically but not limited too, 1. Plaintiff has no felony and 2. has been a process server for one year.

235. Defendant breached the contract stated in Defendant's "Code of Ethics" by retaliating against Plaintiff in the terms and conditions of his membership by terminating him for reporting unlawful and unethical conduct in the Defendant's administration and for filing a claim of such conduct with the IRS and the USDOJ as early as March of 2012.

236. As a result of the Defendant's breach of contract, Plaintiff incurred damages including lost wages and benefits, attorney fees and other consequential damages in an amount to be proven at trial.

## COUNT FOUR:  WRONGFUL TERMINATION

237.  Plaintiff realleges and incorporates by reference paragraphs 1 – 199 above, as if fully set forth herein.

238. Defendant wrongfully terminated/expelled the Plaintiff's from his livelihood  in violation of the public policy of the UNITED STATES OF AMERICA of protecting corporate whistleblowers who report financial and accounting irregularities and fraud, as exemplified by the Sarbanes-Oxley Act, 15 U.S.C. § 1513(e),.

239.  As a result of his wrongful termination, Plaintiff incurred damages including lost wages and benefits, attorney fees and other consequential damages in an amount to be proven at trial.

## COUNT FIVE:  DEFAMATION

240.  Plaintiff realleges and incorporates by reference paragraphs 1 – 199  above, as if fully set forth herein.

241. Defendant unlawfully, intentionally and with malice defamed the Plaintiff after his termination by publishing his name to the NAPPS membership on January 22, 2013 thereby excluding him from the trade that his business was founded on and affecting plaintiff livelihood. When notified by Plaintiff that its conduct violated the law, Defendants refused to retract and reinstate.

242. Defendant's publication was defamatory per se as it published expulsion lists is a death nail to livelihood of similar situated persons.

243. Defendants publication further prevented Plaintiff from access to alternative directory source and group exchanges of work. Specifically it alliance with a company called Serve-Now has also banned me as they did not want conflict with the NAPPS enterprise.

244.  As a result of Defendant's intentionally unlawful and malicious conduct, Plaintiff has suffered damages in the form of pain and suffering; emotional distress; humiliation, embarrassment and degradation; loss in wages and benefits; loss of career prospects and job opportunities; and continuing unemployment.

## PRAYER FOR RELIEF AS TO FEDERAL CLAIMS UNDER SARBANES OXLEY

245.  WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

246. A full make-whole remedy including but not limited to lost income, lost future income , consequential and punitive damages, and pre-judgment and post-judgment interest;

247. Compensatory damages in an amount to be determined at trial to compensate Plaintiff for the damage to reputation, loss of career, humiliation, anguish and emotional distress caused by Defendant's unlawful conduct;

248. An award of reasonable attorneys' fees, costs and litigation expenses; and

249. Such other relief as the Court may deem just or equitable.

Dated this 4  of MARCH , 2013

343 HAZELWOOD AVE
LEHIGH ACRES , FL
33936
239 300 7007